SEYFARTH SHAW LLP
Ellen E. McLaughlin (IL 6181045) (*admitted pro hac vice*)
emclaughlin@seyfarth.com
Cheryl A. Luce (IL 6313386) (*admitted pro hac vice*)
cluce@seyfarth.com
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone:    (312) 460-5000
Facsimile:    (312) 460-7000

SEYFARTH SHAW LLP
Chantelle C. Egan (SBN 257938)
cegan@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:    (415) 397-2823
Facsimile:    (415) 397-8549

Attorneys for Defendant
UNITED STATES SOCCER FEDERATION, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOPE SOLO,<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES SOCCER FEDERATION,<br><br>          Defendant. | Case No. 3:18-cv-05215 JD<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:     February 21, 2019<br>Time:    10:00 a.m.<br>Dept.:    Courtroom 11<br>Judge:   Hon. James Donato<br><br>Complaint Filed: August 24, 2018 |

**TO PLAINTIFF AND HER ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 21, 2019 at 10:00 a.m., or as soon thereafter as the matter can be heard, in Courtroom 11 of the above-entitled Court, located at 450 Golden Gate Avenue, 19th Floor, San Francisco, California, 94102, Defendant UNITED STATES SOCCER FEDERATION, INC. ("Defendant" or "U.S. Soccer") will and hereby moves for an order dismissing the Complaint with prejudice.

This Motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff's allegations are insufficient to state a claim under the Equal Pay Act. Further, Plaintiff's claim arising under Title VII should be dismissed because she failed to exhaust her administrative remedies.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Jay Berhalter In Support Of The Motion To Dismiss the Complaint, and any other related documents filed in connection with this Motion, the papers and records on file in this action, and such other written and oral argument as may be presented to the Court.

DATED: December 31, 2018

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Chantelle C. Egan*
Ellen E. McLaughlin*
Chantelle C. Egan
Cheryl A. Luce*

Attorneys for Defendant
UNITED STATES SOCCER FEDERATION, INC.
*admitted pro hac vice

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................................. 1

II. FACTS ............................................................................................................................... 2

    A. The WNT and MNT Have Separate Players' Associations and Separate CBAs With Separate Pay Structures ................................................................................. 2

    B. Compensation Under the WNT CBA ................................................................... 3

    C. Compensation Under the MNT CBA ................................................................... 5

III. LEGAL STANDARD ........................................................................................................ 6

IV. SOLO'S EPA CLAIM SHOULD BE DISMISSED BECAUSE, UNDER APPLICABLE LAW, IT IS IMPLAUSIBLE ON ITS FACE .................................................................... 7

    A. WNT and MNT Players Do Not Play Soccer in the Same "Establishment" ....... 7

    B. WNT Players and MNT Players Receive Different Pay for Performing Work Under the CBAs That Requires Different Obligations and Responsibility ...... 10

    C. The WNT Guaranteed Salaries Cannot Be Compared to the MNT "Pay-for-Play" Structure Under the EPA ........................................................................ 12

    D. Solo Fails to Plead That She Was Paid Less Than Any MNT Player .............. 13

    E. The Pay Equity Clause in the WNT CBAs Establishes the Affirmative Defense That Any Pay Disparity Is the Result of a "Factor Other Than Sex" ............... 14

V. SOLO'S TITLE VII CLAIM MUST BE DISMISSED BECAUSE SHE FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES ...................................................... 15

VI. CONCLUSION ................................................................................................................ 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Adams v. City of Indianapolis*,
　742 F.3d 720 (7th Cir. 2014) ..................................................................................................2, 6

*Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO (AFSCME) v. Nassau Cty.*,
　609 F. Supp. 695 (E.D.N.Y. 1985) ..............................................................................................7

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)....................................................................................................................6

*Bailey v. SC Dep't of Corr.*,
　No. CV 3:17-3500-TLW-KDW, 2018 WL 2144548 (D.S.C. Feb. 23, 2018) ...................................13

*Baumgardner v. ROA Gen., Inc.*,
　864 F. Supp. 1107 (D. Utah 1994)............................................................................................11

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007)....................................................................................................................6

*Brooks v. Ross*,
　578 F.3d 574 (7th Cir. 2009) ....................................................................................................14

*Brownmark Films, LLC v. Comedy Partners*,
　800 F. Supp. 2d 991 (E.D. Wis. 2011), *aff'd*, 682 F.3d 687 (7th Cir. 2012) ........................................14

*Burke v. 401 N. Wabash Venture, LLC*,
　714 F.3d 501 (7th Cir. 2013) ......................................................................................................7

*Cullen v. Indiana Univ. Bd. of Trustees*,
　338 F.3d 693 (7th Cir. 2003) ....................................................................................................14

*E.E.O.C. v. Port Auth. of New York & New Jersey*,
　768 F.3d 247 (2d Cir. 2014)......................................................................................................11

*Foster v. Arcata Assocs., Inc.*,
　772 F.2d 1453 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986)........................................................8

*Jones v. St. Jude Med. S.C., Inc.*,
　823 F. Supp. 2d 699 (S.D. Ohio 2011), *aff'd*, 504 F. App'x 473 (6th Cir. 2012)..............................13

*Knievel v. ESPN*,
　393 F.3d 1068 (9th Cir. 2005) ................................................................................................2, 7

*Meeks v. Computer Assocs. Int'l*,
　15 F.3d 1013 (11th Cir. 1994) ....................................................................................................9

*Ruiz-Justiniano v. United States Postal Serv.*,
   No. CV 16-1526 (MEL), 2018 WL 3218363 (D.P.R. June 29, 2018) ............................................... 14

*Sims-Fingers v. City of Indianapolis*,
   493 F.3d 768 (7th Cir. 2007) .................................................................................................. 2, 11, 13

*Smith v. Allstate Ins. Corp.*,
   24 F. Supp. 2d 870 (N.D. Ill. 1998), *aff'd sub nom.* 202 F.3d 274 (7th Cir. 1999) .............................. 9

*Spencer v. Virginia State Univ.*,
   224 F. Supp. 3d 449 (E.D. Va. 2016) ............................................................................................ 11, 13

*Stanley v. Univ. of S. California*,
   13 F.3d 1313 (9th Cir. 1994) ................................................................................................................ 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................................................... 6

*Traphagan v. PricewaterhouseCoopers LLP*,
   No. 1:16-cv-00135-TWP-DML, 2017 WL 605165 (S.D. Ind. Feb. 14, 2017) ................................... 14

*United States Soccer Fed'n, Inc. v. United States Women's Nat'l Soccer Team Players
   Ass'n*,
   190 F. Supp. 3d 777 (N.D. Ill. 2016) ..................................................................................................... 3

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
   987 F.2d 429 (7th Cir. 1993) ................................................................................................................. 7

*Vinieratos v. U.S., Dep't of Air Force Through Aldridge*,
   939 F.2d 762 (9th Cir. 1991) ............................................................................................................... 15

*Winther v. City of Portland*,
   21 F.3d 1119 (9th Cir. 1994) ................................................................................................................. 8

**Federal Statutes**

29 U.S.C. § 206 ................................................................................................................................ *passim*

36 U.S.C. § 220524(6) ................................................................................................................................ 9

42 U.S.C. § 2000e ................................................................................................................................ 2, 15

**Rules**

Fed. R. Civ. P. 12 .............................................................................................................................. *passim*

**Regulations**

29 C.F.R. § 1620.9 .................................................................................................................................. 8, 9

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Plaintiff Hope Solo ("Solo") brings this two-count lawsuit against the United States Soccer Federation, Inc. ("U.S. Soccer") for sex-based pay discrimination under the Equal Pay Act, 26 U.S.C. § 206(d) ("EPA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The Complaint alleges that U.S. Soccer pays Men's National Team ("MNT") players more than it pays her and Women's National Team ("WNT") players, and that the difference is attributable to sex discrimination. This is not a case where employees are working side-by-side, doing the exact same job, but getting paid differently for the same work. Rather, this case takes two entirely different categories of professional athletes—athletes who play for different teams, have different obligations, are compensated in fundamentally different ways, and enjoy different benefits—and asks the Court to conclude that they are suitable comparators for each other under the EPA.

Solo's overarching theory is that the WNT has been equally or more successful than the MNT in tournament victories and works just as hard as they do, and so they should be paid the same way. But these facts alone cannot establish an EPA claim.[1] The EPA only remedies sex-based pay discrimination at the same "establishment" for work that requires substantially "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). The allegations in Solo's Complaint fail to raise a plausible inference that WNT and MNT players work in the same establishment and are compensated differently for substantially equal work. Rather, WNT and MNT players work in functionally and operationally distinct establishments, have different opportunities and responsibilities, and have such different pay structures that even Solo does not identify an appropriate MNT comparator that she points to as receiving more pay for "equal work." Further, Solo's Complaint asks the Court to determine that the guaranteed salaries and benefits that WNT players receive are inferior to the flat payments MNT players receive, which entail the negative repercussions of risk and uncertainty. Solo's theory that an EPA claim can survive based on nothing more than a "normative" theory of "comparable work" is "untenable" and outside "the

---

[1] U.S. Soccer agrees with Solo that the WNT has an impressive record and champions the success of the WNT. (*See, e.g.*, Dkt. No. 1-2 at 6.) Indeed, U.S. Soccer has been at the vanguard of supporting women's soccer internationally and provides the WNT with unparalleled compensation and benefits. U.S. Soccer was at the forefront of the charge to persuade FIFA to award increased prize money in connection with the Women's World Cup.

proper domain of the Equal Pay Act, [which] consists of standardized jobs." *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 770-71 (7th Cir. 2007). For these reasons, Solo's Complaint fails to state a claim under the EPA and should be dismissed pursuant to Rule 12(b)(6).

Finally, even if Solo sufficiently pleaded an EPA claim, the Complaint should be dismissed because any differential in pay is plainly attributable to a "factor other than sex": revenue. The WNT collective bargaining agreements ("CBAs") that governed Solo's employment contain a pay equity clause that ensures that their compensation is proportional to the revenue that they generate as compared to the compensation paid to the MNT. These CBAs define the pay structures of WNT and MNT players and are thus incorporated into the facts alleged in the Complaint, and the Court may properly draw conclusions from these materials in ruling on U.S. Soccer's motion under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The pay equity clause in the WNT CBAs shows not only that U.S. Soccer is committed to supporting women's soccer and the WNT and ensuring they are paid fairly, it also permits only one plausible inference that dooms Solo's claim: that U.S. Soccer, at a minimum, compensated the WNT in a proportionate amount to the game revenue they produced, which is a permissible "factor other than sex" that bars Solo's EPA claim. For these reasons, Solo's EPA claim should be dismissed.[2]

## II.    FACTS

### A.    The WNT and MNT Have Separate Players' Associations and Separate CBAs With Separate Pay Structures

The WNT and MNT have organized under separate Players' Associations and have entered into separate CBAs with U.S. Soccer.[3] (Berhalter Decl. ¶¶ 3-5, Exs. A-C.) The CBAs establish fundamentally different compensation structures. Under the WNT agreements, core WNT players (including Solo) receive guaranteed base salaries, medical benefits, injury protection, and other benefits.

---

[2] Solo's Title VII claim is also subject to dismissal because Solo has openly failed to exhaust her administrative remedies.

[3] This paragraph summarizes the facts in Section II that are described in further detail below and are established by the WNT and MNT CBAs, which are attached as exhibits to the Declaration of Jay Berhalter. Excerpts of the 2009-2012 WNT CBA are attached to Berhalter's Declaration as Exhibit A ("Ex. A"). The 2013-2016 WNT Memorandum of Understanding is attached to Berhalter's Declaration as Exhibit B ("Ex. B"). Excerpts of the 2011-2018 MNT CBA are attached to Berhalter's Declaration as Exhibit C ("Ex. C"). All page number references to the exhibits refer to the page number as it appears in the Docket Entry.

By contrast, MNT players are paid for appearances at matches and are called up for tournament rosters under a "pay-for-play" structure that potentially results in no compensation at all for any MNT players who fail to make the roster. WNT players and MNT players are also compensated under their contracts for different work: U.S. Soccer pays the salaries of WNT players who play in the National Women's Soccer League ("NWSL"), while MNT players do not receive *any* professional league salaries under their CBAs.[4] Additionally, MNT players have many international tournament opportunities that do not exist in the women's game, reflecting a dramatically different international playing environment, while the WNT receives a contractual entitlement to Olympic and Olympic qualifying match appearances that the MNT does not have. Finally, the WNT is entitled to many valuable non-monetary benefits that the MNT is not.

### B. Compensation Under the WNT CBA

The WNT Players' Association entered into a CBA with U.S. Soccer effective from 2005 through 2012, and this agreement was modified effective from 2013 through 2016.[5] (Berhalter Decl. ¶¶ 3-5, Exs. A & B.) The same general compensation structure has remained consistent under these CBAs and comprises the following key components:

- ***Base WNT Salary.*** U.S. Soccer paid WNT players a base salary that has ranged from $36,000 to $72,000[6] depending upon their status as a "Tier I," "Tier II," or Tier III" player. (Ex. A at 11-12, 17-18; Ex. B at 2-3.)  Solo earned a base salary of $72,000 per year. (Cmplt. ¶ 14.)

- ***Base NWSL Salary***. In addition to a base WNT salary, U.S. Soccer guarantees all WNT players a salary to play in the National Women's Soccer League ("NWSL"). (Ex. A at 18; Ex. B at 8.) Salaries have ranged from $44,000 to $56,000 during the relevant period, depending on the year

---

[4] Members of the MNT play in professional leagues around the world that are wholly separate from, and not necessarily affiliated with, U.S. Soccer.  U.S. Soccer's willingness to pay the NWSL salaries of WNT players is part of its commitment to developing women's soccer in all forms. The NWSL represents the first ever women's professional league to survive more than six seasons.

[5] The agreement between the WNT Players' Association and U.S. Soccer for 2013-2016 was memorialized in a Memorandum of Understanding, which formed an actual CBA along with the non-modified terms of the 2005-2012 agreement as a matter of law, even though the agreement was never executed in a fully integrated CBA. *United States Soccer Fed'n, Inc. v. United States Women's Nat'l Soccer Team Players Ass'n*, 190 F. Supp. 3d 777, 787 (N.D. Ill. 2016) (entering declaratory judgment that 2013 Memorandum of Understanding between U.S. Soccer and WNT Players' Association formed a CBA).

[6] For the purposes of this motion, U.S. Soccer assumes that the relevant period is August 24, 2015 to the termination of Solo's contract in 2016.

and the player's tenure at WNT. (*Id.*)

- *World Cup and Olympics*. In addition to her base salary, each WNT player on the tournament roster for a World Cup, World Cup qualifying tournament, Olympics, or Olympics match receives a bonus of $10,000 per match. (Ex. A at 15-18; Ex. B at 4.) If the WNT finishes in the top four teams at the World Cup or Olympics tournaments, each player on the tournament roster receives a separate medal bonus. (*Id.*) As of 2016, this medal bonus was $10,000 for fourth or third place, $32,500 for second place, and $50,000 for first place. (*Id.*) In the event that the WNT wins the World Cup or Olympics, the WNT is paid a "victory tour" bonus from a pool of $1,800,000 distributed to all WNT players across a minimum of 10 post-tournament games. (*Id.*)
- *Friendly Win Bonus*. For each friendly match that the WNT wins, each player receives a win bonus, which has ranged from $1,000 to $1,350 in the relevant period. (Ex. A at 13; Ex. B at 4.)
- *Per Diem Payments*. WNT players received per diem payments for each day they are required to be in the venue for practice, matches, or any other purpose. (Ex. A at 17.) During the relevant period, this amount was equal to the greater of: $45 for domestic venues and $55 for international venues, *or* the amount paid to U.S. Soccer players on the MNT as of the time that the relevant CBA was negotiated. (*Id.*) WNT players also receive NWSL per diem payments for days they are required to perform professional league work. (Ex. B at 7.)
- *Sponsor Appearance Fee*. WNT players receive a payment for appearing at sponsorship events, which was equal to $3,000 per appearance in the relevant period. (Ex. A at 16; Ex. B at 5.)
- *Benefits*. Unlike the MNT, WNT players have a contractual right to various non-monetary benefits, including health and vision insurance, injury protection (equal to a player's full salary for up to one year), maternity leave (equal to 50% of a player's salary for the duration of the leave), nanny costs, relocation expenses when traded in the league, and a housing allowance of up to $1,200 each month. (Ex. A at 14-15; Ex. B at 5-6.) In the event that they separate from U.S. Soccer, WNT players are guaranteed a minimum of three months of severance pay. (Ex. B at 4.) Additionally, if a player is released from her WNT contract, she is guaranteed to remain with the NWSL for the remainder of the year. (Ex. B at 9.)

### C. Compensation Under the MNT CBA

The MNT Players' Association entered into a CBA with U.S. Soccer effective from 2011 through 2018, establishing the compensation structure for MNT players. (Berhalter Decl. ¶ 5, Ex. C.) Unlike the WNT, whose core monetary benefits are in the form of guaranteed WNT and NWSL salaries, the MNT is compensated strictly through a "pay-for-play" structure in which they are paid for individual match appearances and being on a tournament or tournament-qualifying match roster. (*Id.*) A MNT player who is not called up to be on the roster receives no compensation at all. (*Id.*) The MNT compensation structure comprises the following key components:

- *World Cup*. MNT players who are on the roster for World Cup or World Cup qualifying matches receive flat payments for each match for which they are on the roster. (Ex. C at 13-15, 16-20.) These payments vary depending on whether the match results in a win, draw, or loss and whether the game was in Round 1 or Round 2. (*Id.*) In addition to these flat payments, MNT players on the World Cup tournament roster participate in a team player pool, which has varied in the relevant period from $175,000 to up to $9,375,000 for a World Cup victory. (*Id.*)

- *No Guaranteed Olympic Appearance Fees.* MNT players are not guaranteed to be paid anything under their CBAs for appearances at Olympics and Olympics qualifying matches or for being on the Olympics tournament roster, and the MNT does not even play in the Olympics. (*See generally* Ex. C.) Indeed, many MNT players are ineligible to compete in the Olympics because they are older than the 23-year age limit, whereas WNT players competing in the Olympics are not subject to an age limit. Fédération Internationale de Football Association ("FIFA") Regulations for the Olympic Football Tournaments, § 13.4.[7]

- *Gold Cup, Copa America / Centenario, and Confederations Cup*. MNT players have the opportunity to play in multiple international tournaments for which there is no equivalent opportunity for WNT players, reflecting the larger world market for men's international soccer. (Ex. C at 11-13, 16-20.) Like they do for World Cup games, MNT players receive a match appearance fee for any Gold Cup, Copa America / Centenario, or Confederations Cup match in which they are on the tournament roster. (*Id.*) These payments also vary depending on the

---

[7] *Available at* https://img.fifa.com/image/upload/dsonjzvqypejv6ovgjfo.pdf.

|   |   |
|---|---|
| 1 | outcome of the match (ranging in the relevant period from $4,000 for a loss to $15,375 for a |
| 2 | win). (*Id.*) There is further differentiation between Gold Cup and Copa America / Centenario |
| 3 | payments depending on the FIFA ranking and nation of the MNT's opponent. (*Id.*) On top of |
| 4 | their Copa America / Centenario and Confederations Cup match appearance fees, MNT players |
| 5 | receive various bonuses for advancing to the second round of competition and for placing those |
| 6 | the tournaments (ranging from $10,000 to $35,000 in the relevant period). (*Id.*) |

- ***Friendly Match Appearances***. MNT players receive a flat payment for friendly match appearances in which they are on the MNT roster that varies depending on the ranking of the opponent and whether the game resulted in a win, loss, or a draw (ranging from $4,000 to $17,625 in the relevant period). (Ex. C at 11, 16-18.)

- ***Per Diem Payments***. Under the CBA, from 2011 to 2014, MNT players received per diem payments for each day they are required by U.S. Soccer to be in the venue for practice, matches, or any other purpose in an amount equal to the greater of: $50 for domestic venues and $60 for international venues. (Ex. C at 16-17.) This amount was increased to $62.50 for domestic venues and $75 for international venues in the 2015-2018 CBA. (*Id.*)

- ***Sponsor Appearance Fee***. Prior to 2015, MNT players received a payment for appearing at sponsorship events of $3,000 per appearance. (Ex. C at 15-16.) This fee was increased to $3,750 in 2015-2018. (*Id.* at 16-17.)

### III. LEGAL STANDARD

A viable complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "[A] plaintiff's obligation to provide the grounds for his entitlement to relief requires more than labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). While the Court is generally limited in its review on a motion to dismiss to the facts alleged in the complaint, it may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014) (same). Moreover, "[t]he court is not bound to accept the pleader's allegations to the effect of the exhibit, but

can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material." *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013) (internal quotations and citation omitted); *see also Knievel*, 393 F.3d at 1076 (district court properly considered documents attached to defendant's motion to dismiss where the claim depends on the contents of the document); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993) (district court properly considered documents attached to defendant's motion to dismiss without converting it to a motion for summary judgment because they were central to the plaintiff's claim and were the core of the parties' contractual relationship).

### IV.    SOLO'S EPA CLAIM SHOULD BE DISMISSED BECAUSE, UNDER APPLICABLE LAW, IT IS IMPLAUSIBLE ON ITS FACE

Solo's EPA claim is subject to dismissal for several reasons. First, WNT and MNT players cannot plausibly be deemed to work in the same "establishment" (limited to the same physical space under the EPA except in unusual circumstances). Second, the CBAs demonstrate that WNT and MNT players had vastly different opportunities and responsibilities and not the substantially equal work that the EPA requires. Third, because their compensation structures are fundamentally different, asking the Court to determine that one is more favorable than the other goes beyond what the EPA permits. Fourth, Solo fails to plead that any MNT player was paid more than her, and the only plausible inference is that Solo potentially earned more than some MNT payers. Fifth, the pay equity clause in the WNT CBAs establishes U.S. Soccer's affirmative defense that differences in WNT total compensation is based on a "a factor other than sex" that precludes her from succeeding under the EPA.

#### A.    WNT and MNT Players Do Not Play Soccer in the Same "Establishment"

The EPA bars employers from sex-based pay discrimination among employees at a single "establishment." 29 U.S.C. § 206(d)(1).  Solo's Complaint contains no allegations that the WNT and MNT played at the same "establishment"—which, by itself, warrants dismissal. *Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO (AFSCME) v. Nassau Cty.*, 609 F. Supp. 695, 704 (E.D.N.Y. 1985) (dismissing EPA claim pursuant to Rule 12(b)(6) where plaintiffs "plainly failed to allege the establishment element necessary to state a claim under the EPA"). Moreover, the CBAs upon which Solo's EPA claim relies demonstrate that the WNT and MNT are physically and functionally separate

organizations. Thus, they cannot plausibly form a single "establishment" under the EPA.

The WNT and MNT play soccer and perform services for U.S. Soccer in physically separate spaces. (*See generally* Cmplt. and CBAs, discussing distinct domestic and international competitions, NWSL participation, training camps, travel, and media sessions.) Beyond the obvious fact that they do not share the field at game time, the CBAs incorporated into Solo's Complaint demonstrate that they compete in entirely different competitions. The MNT, for example, competed in three international competitions (the Gold Cup, Copa America / Centenario, and Confederations Cup) during the relevant time frame, in addition to the Men's World Cup and the Olympics, whereas the WNT competed at the Women's World Cup and the Olympics. (Ex. A at 15-18; Ex. B at 4.) Even at the Olympics, the WNT and MNT have different opportunities because different age restriction rules apply to the WNT (who have no age restrictions to play in the Olympics) as opposed to the MNT (who can only play in the Olympics if they are under 23). Thus, not only do the two teams play in physically separate spaces, they play in different competitions, venues, and countries at different times. Separate physical entities do not typically form a single "establishment" under the EPA. Rather, "establishment … refers to a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business. Accordingly, each physically separate place of business is ordinarily considered a separate establishment." 29 C.F.R. § 1620.9.

Nor is it plausible that the WNT and MNT are a single "establishment" under any exception to the general rule that physically distinct entities are separate establishments. Such exception applies only in "unusual circumstances." *Id.* Federal courts applying these "unusual circumstances" look to factors showing that the two entities are sufficiently interrelated. *Winther v. City of Portland*, 21 F.3d 1119 (9th Cir. 1994) (employees did not work at "same establishment" where they were subject to separate CBAs, had separate budgets, were run by independent management with independent decisionmaking authority, and served different functions); *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453 (9th Cir. 1985), *cert. denied,* 475 U.S. 1048 (1986), *overruled on other ground by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991) (holding that employees did not work at the same establishment under the EPA where their branches were "operationally distinct"). The EEOC regulation also provides some examples of "unusual circumstances" that permit an inference that two separate spaces are a single establishment,

including that: (1) one administrative unit sets wages and assigns locations of employment, (2) employees frequently interchange work locations, and (3) daily duties are virtually identical and performed under similar working conditions. 29 C.F.R. § 1620.9.

Such an inference is implausible here. First, the wages of WNT and MNT players are set by separate collective bargaining units in agreements that also set forth the locations of their domestic and international employment. The WNT and MNT negotiated separate agreements through separate Players' Associations and have entirely different compensation structures. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1017 (11th Cir. 1994) (employees worked at different establishments where there was no uniform compensation practice between different locations); *cf. Smith v. Allstate Ins. Corp.,* 24 F. Supp. 2d 870, 879 (N.D. Ill. 1998), *aff'd sub nom.* 202 F.3d 274 (7th Cir. 1999) (employees worked at same establishment where different locations had "the same pay grades and compensation practices"). Their separate CBAs foreclose any inference that WNT and MNT wages are set by the same administrative unit. They further delineate the different opportunities at different locations afforded to WNT players (i.e., Olympics, Women's World Cup, and NWSL) and MNT players (i.e., the Men's World Cup, the Gold Cup, Copa America / Centenario, and Confederations Cup).

Second, WNT and MNT players cannot interchange work locations because MNT players are restricted from participating in the WNT international competitions. For example, the FIFA eligibility regulations and United States Olympic Committee bylaws expressly contemplate that the women's team will comprise female players and the men's team will comprise men's players. *See* FIFA Regulations for the Olympic Football Tournaments, § 5.2[8] (permitting each host association to enter "one men's and one women's team" in the Olympics); 36 U.S.C. § 220524(6) (contemplating "separate programs for male and female athletes"). Because MNT players cannot play on the WNT, employees of the two entities are not interchangeable and cannot plausibly form a single establishment.

Third, it is implausible that the WNT and MNT perform work under similar working conditions. As Solo admits through the attachments to her Complaint, the WNT and MNT are led by different coaches who control player opportunities. (Dkt. No 1-2 at 26-27, identifying different WNT and MNT coaches.) Further, the only plausible inference that can be drawn from the WNT and MNT CBAs is that

---

[8] *Available at* https://img.fifa.com/image/upload/dsonjzvqypejv6ovgjfo.pdf.

they face different international competition. This matters because the differences are determinative of their pay and justifies the logic behind requiring that employees asserting EPA claims work in the same "establishment." For MNT players in particular, the quantity of game opportunities is the primary driver of their pay, and this in turn depends on their performance *relative* to the performance of their international competition. This disparity in competitive opportunities confirms that they should be treated as distinct "establishments" under the EPA. As Solo herself notes, the WNT "has enjoyed unparalleled success in international soccer," ultimately winning its third World Cup in 2015, while the MNT lost in the Round 16 in the 2014 World Cup. (Cmplt. ¶¶ 6, 17.) Although Solo tries to spin these differences into a normative argument that WNT players should earn the same (or more) because of their successes, these allegations highlight the differences the MNT and WNT experience in international competition and emphasize why the MNT and WNT should not be treated as a single "establishment" under the EPA as a matter of law. Accordingly, the Complaint should be dismissed with prejudice.

### B.   WNT Players and MNT Players Receive Different Pay for Performing Work Under the CBAs That Requires Different Obligations and Responsibility

The Complaint and CBAs demonstrate that the WNT and MNT have incongruous responsibilities and obligations and thus do not perform work that requires substantially equal "effort[] and responsibility" as required to state a claim under the EPA. 29 U.S.C. § 206(d)(1). The MNT is paid for playing soccer in not only friendly and Men's World Cup matches, but also three other men's competitions (the Gold Cup, the Copa America / Centenario, and the Confederations Cup). The WNT is paid a flat amount for competing in *all* matches, in addition to receiving bonus payments for friendly victories and appearances at tournament and tournament-qualifying matches. (Ex. A at 11-13, 17-18; Ex. B at 2-4.) For Olympic and Olympic qualifying matches, only the WNT players receive a guaranteed bonus under their contracts. (Ex. A at 15-18; Ex. B at 4.) Additionally, some WNT players (including Solo) receive salaries for playing in the NWSL—a benefit that MNT players do not receive directly from U.S. Soccer under their CBAs.  (Ex. A at 18; Ex. B at 8.) The following table summarizes the core different opportunities and rewards that WNT and MNT players enjoy:

| Unique to WNT | Unique to MNT |
| --- | --- |
| • Guaranteed WNT base salary<br>• Guaranteed NWSL base salary<br>• Bonuses for friendly match wins<br>• Bonuses for Olympics and qualifying matches and placement awards<br>• Health and vision insurance benefits<br>• Injury protection<br>• Maternity leave<br>• Nanny costs<br>• Housing allowance<br>• NWSL contract protections<br>• Severance benefits | • Friendly match appearance fees<br>• Gold Cup appearance fees and placement awards<br>• Copa America / Centenario appearance fees and placement awards<br>• Confederations Cup appearance fees and placement awards |

Solo's Complaint selectively mentions the discrete pay components that the two teams have in common in an effort to hide the differences between WNT and MNT responsibilities under their respective agreements. But the CBAs, which are necessarily incorporated into the Complaint's allegations, provide for two completely different sets of responsibilities and effort on the part of the players that preclude an inference that they entail equal effort and responsibility. This flaw also warrants dismissal. *E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 255 (2d Cir. 2014) (dismissing EPA claim pursuant to Rule 12(b)(6) because the EEOC failed to plead facts showing that same job held by male and female attorneys required equal "skill, effort, and responsibility"); *Spencer v. Virginia State Univ.*, 224 F. Supp. 3d 449, 457 (E.D. Va. 2016) (dismissing EPA claim pursuant to Rule 12(b)(6) because courts "need not presume that [employees] employed in different departments perform 'substantially equal work for wage discrimination comparisons under the EPA").

In light of the vastly different expectations of WNT and MNT players, Solo's claim must be dismissed. "The proper domain of the Equal Pay Act consists of standardized jobs" and does not apply to separate operations that are "heterogeneous." *Sims-Fingers*, 493 F.3d at 770-71. The effort and responsibility expected of the WNT and MNT under their respective agreements are far from standardized and lack the homogeneity that can plausibly support an EPA claim. As such, Solo's Compliant "contemplates a claim of comparable worth which is inadequate to support an Equal Pay Act claim." *Baumgardner v. ROA Gen., Inc.*, 864 F. Supp. 1107, 1109 (D. Utah 1994) (dismissing claim pursuant to Rule 12(b)(6) where plaintiffs "made no effort to allege how each of their positions are 'substantially equal' to [his] position").

### C. The WNT Guaranteed Salaries Cannot Be Compared to the MNT "Pay-for-Play" Structure Under the EPA

The apples-to-oranges comparison that Solo attempts to make between WNT and MNT players, who have entirely different compensation structures, fails under the EPA because it does not seek a comparison of total payment divided by a common denominator. 29 U.S.C. § 206(d)(1) (forbidding employers from paying employees "a *rate* less than the *rate* at which he pays wages to employees of the opposite sex" (emphasis added)). Rather, it asks the Court to make a normative judgment as to whether guaranteed salaries plus benefits are less favorable for WNT players than the larger match appearance fees paid to MNT players that depend on unpredictable factors and are riskier. As Solo admits, WNT players are primarily compensated through the core financial benefit of a salary plus smaller bonuses for certain achievements and appearances rather than through a "pay-for-play" structure like the MNT. (Cmplt. ¶ 14-19.) Moreover, the MNT players' match appearance fees are typically subject to the FIFA ranking of their opponents and less predictable because they are tied to the outcome of the match (i.e., a win, draw, or loss). (Ex. C at 11-13.) In addition to their base salary, WNT players receive benefits that the MNT players do not receive, including health insurance, injury protection, maternity leave, nanny costs, relocation expenses, a housing allowance, and severance pay. (Ex. A at 14-15; Ex. B at 4-6.) Plus, most WNT players are guaranteed a salary to play in the NWSL. (Ex. A at 18; Ex. B at 8.) There are certainly benefits to the MNT pay structure for those players who routinely earn a spot on the MNT roster, but the WNT players receive a different type of financial benefit: the stability and protection embodied in the annual salaries, contract protections, and benefits guaranteed in the WNT CBAs.

Ignoring these fundamental differences, Solo alleges in conclusory fashion that a "disparity in pay trickles down to nearly every aspect of the WNT player/Federation employer relationship" (Cmplt. ¶ 19). Solo only actually alleges four such disparities: different flat rates of pay for friendly appearances, different flat rates of pay for World Cup appearances, different per diem payments, and different sponsor appearance fees. Solo conveniently fails to account for the two base salaries she received for being an WNT player (which compensate her for playing WNT games in addition to the bonus and per diem payments) and a NWSL player, or the other numerous benefits that WNT players receive that MNT players do not receive. (Cmplt. ¶¶ 12-18.) Considering those benefits begs the question at the heart

of Solo's claim: are the stable salaries, benefits, income protection, and support for the WNT players' efforts in the national women's professional league a worse deal than what the MNT players get under their contracts? As the Seventh Circuit commented in *Sims-Fingers*, the EPA's only answer is to this question is, "Who knows? … [T]here are no good answers to the normative question, or at least no good answers that are within the competence of judges to give." 493 F.3d at 771. The fundamental differences in WNT and MNT pay structures make Solo's claim at its core—that MNT players are paid better than WNT players—implausible. *See Jones v. St. Jude Med. S.C., Inc*., 823 F. Supp. 2d 699, 757 (S.D. Ohio 2011), *aff'd*, 504 F. App'x 473 (6th Cir. 2012) (distinguishing between guaranteed salaries versus commission-based earnings subject to payback, discussing benefits of being paid a guaranteed salary with no negative repercussions, and concluding that resulting differentials were based on factors other than sex). Even construing all inferences in Solo's favor, her EPA claim fails because she asks the Court to make a normative decision about whether the WNT's guaranteed salaries with benefits are better or worse than the MNT's "pay-for-play" match appearance fees.

### D. Solo Fails to Plead That She Was Paid Less Than Any MNT Player

Solo compares herself to MNT players generally and fails to identify any male player who earned more for performing the same work. This, alone, also dooms her EPA claim. *Bailey v. SC Dep't of Corr*., No. CV 3:17-3500-TLW-KDW, 2018 WL 2144548, at *7 (D.S.C. Feb. 23, 2018) ("Without a framework for when the alleged comparators worked and without any comparison of the 'skill, effort, and responsibilities' of the comparators' work compared with the work of Plaintiff, she has not set out facts sufficient to establish a plausible cause of action for violation of the EPA."). Solo generally identifies her comparators as the entire MNT rather than any specific MNT player, which leaves the Court with no way of analyzing Solo's allegations that she and her putative comparators performed work that required substantially equal skill, effort, and responsibility. Nor can the Court determine if Solo was, in fact, paid less than MNT players. Under the "pay-for-play" structure of the MNT CBA, MNT players who did not consistently make the roster would have earned less than Solo, and Solo obviously cannot succeed on an EPA claim against a male soccer player who earned less than she earned. "As a result, [Solo's] proposed comparators [do not] supply a logical, analytical basis to support a plausible wage discrimination claim under the EPA." *Spencer*, 224 F. Supp. 3d at 457 (dismissing

1   EPA claim pursuant to Rule 12(b)(6)). For this additional reason, the Complaint should be dismissed.

**E.   The Pay Equity Clause in the WNT CBAs Establishes the Affirmative Defense That Any Pay Disparity Is the Result of a "Factor Other Than Sex"**

The EPA contains a statutory affirmative defense barring recovery if the alleged pay differential is "based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv); *Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 702 (7th Cir. 2003). The pay equity clause contained in the WNT CBAs ensures that any pay differential between WNT and MNT players is attributable to a factor other than sex: the revenue generated by the team's games. Thus, Solo's Complaint should be dismissed because "an affirmative defense can be the basis for a dismissal under Fed. R. Civ. P. 12(b)(6) when the allegations of the complaint and material incorporated into the complaint set forth everything necessary to satisfy the affirmative defense." *Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 998 (E.D. Wis. 2011), *aff'd*, 682 F.3d 687 (7th Cir. 2012) (quoting *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009)); *Traphagan v. PricewaterhouseCoopers LLP*, No. 1:16-cv-00135-TWP-DML, 2017 WL 605165, at *3 (S.D. Ind. Feb. 14, 2017) (finding that facts pleaded at motion to dismiss stage established employer's affirmative defense that pay disparity was based on "factor other than sex" and dismissing claim pursuant to Rule 12(b)(6)); *Ruiz-Justiniano v. United States Postal Serv.*, No. CV 16-1526 (MEL), 2018 WL 3218363, at *16 (D.P.R. June 29, 2018) (holding that implications from documents fairly incorporated into the complaint established employers' affirmative defense that pay disparity was based on "factor other than sex" and dismissing EPA claim pursuant to Rule 12(b)(6)).

At all times during the relevant period, the WNT's CBAs have included a pay equity clause that states, "If in any calendar year, the ratio of aggregate compensation of women's national team players to the aggregate revenue from all women's national team games … is less than the ratio of the aggregate compensation of the men's national team players compensation to the aggregate revenue from all men's national team games …, then U.S. Soccer will make a lump sum payment to the women's national team player pool to make the ratios equal." (Ex. A at 18.) The pay equity clause ensures that the WNT received an equivalent share of the revenue of its games produced as did the MNT. Since Solo's theory necessarily asks the Court to consider the total compensation paid to WNT and MNT players because of their incongruous pay structures, that compensation can never be less than proportional to the revenue

from WNT games and tournaments. *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1321 (9th Cir. 1994) (holding that pay differential was based on "factor other than sex" where men's basketball team generated more revenue than women's basketball team). By guaranteeing that the WNT's comparative compensation is tied to the amount of game revenue the WNT and MNT produce, it establishes U.S. Soccer's affirmative defense that any pay differential between Solo and MNT players is based on a "factor other than sex."

## V. SOLO'S TITLE VII CLAIM MUST BE DISMISSED BECAUSE SHE FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES

Before filing a suit in federal court alleging sex discrimination under Title VII, a plaintiff must file a timely charge of sex discrimination and receive a right to sue letter from the EEOC. 42 U.S.C. § 2000e–16(c); *Vinieratos v. U.S., Dep't of Air Force Through Aldridge*, 939 F.2d 762, 768 (9th Cir. 1991). These statutory requirements are prerequisites to filing a lawsuit and are grounds for dismissal pursuant to Rule 12(b)(6) if not satisfied. *Id.* Solo alleges that although she filed a charge with the EEOC on March 30, 2016, "[t]he EEOC has not yet issued a right to sue letter." (Cmplt. ¶ 22.) Solo cannot bring a claim unless and until the EEOC issues a right to sue letter and has failed to exhaust her administrative remedies. Accordingly, Solo's Title VII claim should be dismissed.

## VI. CONCLUSION

Solo's Complaint fails to plead a claim upon which relief may be granted under the Equal Pay Act and has failed to exhaust her administrative remedies under Title VII. Accordingly, the Complaint should be dismissed pursuant to Rule 12(b)(6).

DATED: December 31, 2018              Respectfully Submitted,

                                      SEYFARTH SHAW LLP

                                      By: */s/ Chantelle C. Egan*
                                          Ellen E. McLaughlin*
                                          Chantelle C. Egan
                                          Cheryl A. Luce*

                                          Attorneys for Defendant
                                          UNITED STATES SOCCER FEDERATION, INC.
                                          **admitted pro hac vice*